1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                        EASTERN DISTRICT OF CALIFORNIA

10

11    JILL WASCHE,                              No.  2:18-cv-02246-MCE-DB

12                   Plaintiff,

13          v.                                   **MEMORANDUM AND ORDER**

14    ORCHARD HOSPITAL and DOES
      1-50, inclusive,
15
                     Defendant.
16

17

18          In bringing the present case, Plaintiff Jill Wasche ("Plaintiff") seeks damages from

19    her former employer, Defendant Orchard Hospital ("Defendant" or the "Hospital"), on

20    grounds that she was terminated due to gender discrimination, harassment and

21    retaliation for having complained of gender discrimination and for exercising her rights

22    under the federal Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, and its

23    California counterpart, the California Family Rights Act, as incorporated within

24    California's Fair Employment and Housing Act, ("FEHA"), Cal. Govt. Code §§ 12940,

25    et seq.  Plaintiff asserts five causes of action rooted in FEHA as well as an additional

26    claim for wrongful termination, also premised on FEHA violations.  Defendant removed

27    Plaintiff's complaint from state court, where this action was commenced, citing federal

28    question jurisdiction under 28 U.S.C. § 1331.

1

Presently before the Court is Defendant's Motion for Summary Judgment, or alternatively for partial summary judgment (ECF No. 13) as to Plaintiff's various causes of action.  According to the Hospital, none of Plaintiff's claims are viable and she cannot show she is entitled to punitive damages.  Defendant's Motion is DENIED.[1]

## BACKGROUND[2]

Plaintiff was initially hired by the Hospital, a patient care facility located in Gridley, California, as a respiratory therapist in 2009.  By 2014, she had received several promotions and was managing both respiratory therapy and laboratory services for the Hospital.  Tracy Atkins, Defendant's Chief Nursing Officer, was Plaintiff's direct supervisor from October 2012 until the time Plaintiff's employment with the Hospital ended in 2017.  SUF No. 17.

Steve Stark became Defendant's Chief Executive Officer ("CEO") on January 1, 2015.  SUF No. 23.  Later that year, Hardeep Mundh stepped down as the Hospital's Director of Quality, Accreditation, and Risk Management.  Mundh, a registered nurse, also served as Defendant's Director of Infectious Prevention.  Plaintiff ultimately applied for and obtained the directorship position Mundh had vacated.

Given her promotion from a managerial position to a directorship role, Plaintiff asked for a raise to $50.00 per hour, an amount apparently consistent with Mundh's prior pay rate.  Stark agreed to the increase, but only if Plaintiff obtained additional certifications.  SUF No. 39.  Plaintiff subsequently obtained the needed certifications and received the requested salary increase.  SUF No. 40.

---

[1] Having determined that oral argument was not of material assistance, the Court submitted this Motion on the briefs in accordance with E.D. Local Rule 230(g).

[2] The following recitation of facts is taken, sometimes verbatim, from Pl.'s Response to Def.'s Statement of Undisputed Material Facts in Support of its Mot. for Summ. J. (ECF No. 19-1) ("SUF") and Def.'s Response to Pl.'s Separate Statement of Disputed Material Facts in Support of her Opp'n to Def.'s Mot. for Summ. J. (ECF No. 20-1) ("DMF").  The specific evidentiary citations are contained within those documents and need not be further reiterated in this Memorandum and Order.

1    At about the same time, one John Helvey was promoted to Chief Information

2 Officer.  Plaintiff was not interested in that particular job, but avers she nonetheless

3 complained to the Human Relations Director, Lutch Perumal, because Helvey was

4 allegedly Stark's friend and "golfing buddy," had less impressive credentials than

5 Plaintiff, and was not required to obtain additional certifications.  DMF No. 12.  Plaintiff

6 informed Perumal that it was her perception that Stark had treated her differently

7 because she was female.  DMF No. 10.  Plaintiff purportedly further complained that

8 Stark withheld resources, misrepresented the workload encompassed by her various

9 roles, and did not provide her an adequate raise to account for her increased

10 responsibilities and workload.  Pl.'s Dep., 151:10-152:2.[3]  Although Plaintiff contends she

11 complained to both Perumal and Atkins (id.; see also Pl.'s Decl., ¶¶ 10, 12), there is no

12 written evidence of such complaints.

13    In late 2016, the Hospital reclassified a number of exempt positions to non-

14 exempt and conducted a presentation to employees to explain the reason for the

15 changes.  SUF Nos. 69, 73.  Until this point, Plaintiff had been an exempt employee.

16 SUF No. 75.  She disagreed with the reclassification of her position because her job

17 duties required her to be available twenty-four hours a day, she made more than four

18 times the hourly amount required for exempt status, and she met all the duty

19 requirements for an exempt employee as identified by Stark.  SUF No. 76.  According to

20 Plaintiff, two other female directors were also relegated to non-exempt status, but a male

21 director, John Turner, was not.  SUF No. 68.

22    Plaintiff claims that because her job could not be performed within the course of

23 regular work hours, she ended up having to work at home, primarily responding to phone

24 calls and emails.  When Stark and Atkins discovered Plaintiff was working outside of the

25 office, they purportedly reminded Plaintiff that she was required to work during her

26 assigned workday.  SUF No. 78.

27       [3] Pertinent portions of depositions taken in these proceedings, as well as declarations and other
evidence, are contained within Compendia of Evidence submitted by both sides in connection with this
28 Motion.  ECF Nos. 13-3, 13-4, 19-4.

1     Plaintiff, on the other hand, claims that Atkins instead suggested she apply for

2   FMLA leave because Plaintiff had a young autistic son who required care that could not

3   always be accommodated by Plaintiff's regular schedule, and it would give her more

4   flexibility with her work schedule.  Significantly, according to Plaintiff, Atkins told her

5   generally not to worry and to "just do what you got to do."  Plaintiff claims she thereafter

6   took "intermittent FMLA" leave and continued on Atkins' advice to manage her time as

7   she saw fit.  While Plaintiff admitted that some of her conversations with Atkins about

8   time flexibility occurred while she was on exempt status, she insists that they continued

9   after Plaintiff had been reclassified.  See Pl.'s Dep., 86:24-88:16.

10     In December 2016, Plaintiff submitted an application for intermittent leave under

11   the FMLA to Patricia Stahlberg in Human Resources.  Stahlberg was required to get final

12   approval from Stark, who was then serving as acting Human Resources Director at the

13   time.  SUF No. 84.  According to the medical certification Plaintiff submitted in support of

14   her request, Plaintiff's son was prone to behavioral episodes up to three times per

15   month, each of which could last up to an entire day.  Id. at No. 87.   Plaintiff claims her

16   son was particularly susceptible to such episodes in the mornings, and her need to

17   intervene sometimes interfered with her ability to get to the Hospital at the appointed

18   time.

19     Stahlberg eventually notified Plaintiff that the FMLA leave she requested had

20   been approved, but Plaintiff still could not work from home and would have to use Paid

21   Time Off ("PTO") in the event she needed time to care for her child.  Plaintiff alleges that

22   Defendant failed to provide any formal training to her with regards to how FMLA worked.

23   SUF No. 89.  Plaintiff thus kept in contact with her supervisor, Tracey Atkins, who told

24   her to keep doing what she was doing, even after her conversation with Stahlberg.

25   Given Plaintiff's communication with Atkins, Plaintiff claims she reasonably believed she

26   was utilizing her FMLA leave in the correct manner.  Id.

27     Caring for her son also made it difficult for Plaintiff to make early morning

28   management safety meetings during March and April 2017.  Pl's Dep., 91:17-92:4.  She

4

1    estimates that 90 percent of her attendance issues were related to her son's needs and

2    that Atkins told her specifically that it was not a problem.  Id. at 62:2-10; 66:8-11.

3    Regardless, Plaintiff claims that while monitoring her son's additional needs, she

4    multitasked by checking emails and performing other job functions.  SUF No. 81.[4]

5         Atkins recognized at her deposition that Plaintiff's position as Director carried a lot

6    of responsibility and that she knew Plaintiff also faced complications caring for her son.

7    Atkins Dep., 8:19-9:11; 11:18-25.  Atkins also testified that she realized this impeded

8    Plaintiff's ability to work standard hours and she knew that Plaintiff took intermittent

9    FMLA leave to care for her son some mornings.  Id. at 12:8-11.  According to Defendant,

10   however, the FMLA-use chart maintained by Human Resources for Plaintiff indicates

11   that Plaintiff only exercised intermittent FMLA leave one time, for eight hours on

12   February 24, 2017.  SUF No. 94.

13        In addition, Defendant contends, other than individuals specifically designated as

14   on-call, employees were technically required to clock in and out while at the Hospital.

15   Defendant claims these rules were reiterated at a monthly manager/director meeting

16   Plaintiff attended on January 26, 2017.  Id. at No. 99.

17        In May of 2017, one of the Hospital's managers, Lee Harrison, was looking for

18   Plaintiff prior to one of the Hospital's early morning safety management meetings. The

19   Hospital's payroll manager, Kim Lewellen, told Harrison that Plaintiff had been clocked in

20   for over an hour.  Id. at Nos. 118-19.  About an hour after the meeting had started,

21   however, Harrison saw Plaintiff arrive to work, and she reported that time discrepancy to

22   Hospital management.

23   ///

24   ///

25   ///

26   ///

27

28        [4] At some point herein, Plaintiff also purportedly raised concerns with Defendant's approach to a
     mandatory evacuation necessitated by the risk of failure of the Oroville Dam Spillway.

1    The Hospital's Human Resources Director, Kami Duntsch, along with Atkins and

2  Helvey, subsequently conducted an investigation into Plaintiff's timekeeping practices

3  between January 1, 2017 and April 30, 2017.  Id. at Nos. 126, 131.[5]

4    Duntsch and Atkins met with Plaintiff on May 17, 2017 to discuss the Hospital's

5  investigation.  SUF No. 133.  During the meeting, Plaintiff indicated that she would at

6  times clock in from home when she was working there or checking her emails.  She

7  would then drop her son at school and drive to work while on the clock.

8    Atkins admitted in her deposition that she only kept records of occasions where

9  Plaintiff emailed her about taking FMLA leave and consequently did not rule out calls to

10  her may have been made by Plaintiff.  Atkins Dep., 19:21-20:3.  Significantly, too, Atkins

11  conceded that she had ongoing discussions with Plaintiff about managing her son and

12  workload so as to be available both for her son and her family in general.  Id. at 17:20-

13  18:1.  Moreover, as indicated above, Atkins stated she knew that Plaintiff's need to stay

14  home some mornings was for intermittent FMLA leave.  Id. at 18:19-25.  She conceded

15  that there was possibly some confusion about how Plaintiff could take FMLA benefits

16  given her ongoing conversations with Plaintiff.  Id. at 15:1-9.

17    While Atkins testified that she did not believe Plaintiff was lying about starting her

18  workday some mornings before reaching the hospital, Atkins nonetheless ultimately

19  concluded that Plaintiff could not account for and/or document all the time she was

20  working.  Id. at 17:5-19.  At the same time, Atkins nonetheless also testified that she still

21  considered Plaintiff a good employee and that she would still be working at the Hospital

22  if it was up to her.  Id. at 21:25-22:2.  Duntsch maintained, however, that the Hospital

23  ///

24  ///

25  ///

26    _____

[5] The Court recognizes that Plaintiff has submitted substantial objections to much of the evidence
27  cited to by Defendant in opposition to Defendant's request for summary judgment. To the extent this
background section cites to evidence that was subject to those objections, the objections are overruled.
28  The Court need not specifically rule on evidence not relied upon in this Memorandum and Order and does
not do so.

1    had a "zero tolerance" policy for "stealing", no matter how good the employee.  Duntsch

2    Dep., 19:23-25.[6]

3         According to Duntsch, Stark ultimately decided to terminate Plaintiff.  Duntsch

4    Dep., 18:24-19:5.  Stark testified that once he realized how "bad" the discrepancies in

5    Plaintiff's timekeeping were, he felt he had no other option.  Plaintiff was thereafter

6    terminated on May 23, 2017.[7]   SUF Nos. 137-138.

7

8                                    **STANDARD**

9

10        The Federal Rules of Civil Procedure provide for summary judgment when "the

11   movant shows that there is no genuine dispute as to any material fact and the movant is

12   entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Celotex Corp. v.

13   Catrett, 477 U.S. 317, 322 (1986).  One of the principal purposes of Rule 56 is to

14   dispose of factually unsupported claims or defenses.  Celotex, 477 U.S. at 325.

15        Rule 56 also allows a court to grant summary judgment on part of a claim or

16   defense, known as partial summary judgment.  See Fed. R. Civ. P. 56(a) ("A party may

17   move for summary judgment, identifying each claim or defense—or the part of each

18   claim or defense—on which summary judgment is sought.");  see also Allstate Ins. Co. v.

19   Madan, 889 F. Supp. 374, 378-79 (C.D. Cal. 1995).  The standard that applies to a

20   motion for partial summary judgment is the same as that which applies to a motion for

21   summary judgment.  See Fed. R. Civ. P. 56(a); State of Cal. ex rel. Cal. Dep't of Toxic

22   ─────────────

23        [6] Defendants calculated the value of the time Plaintiff was accused of stealing at approximately $1,000.  They inexplicably analyzed Plaintiff's time cards over an eight-month period despite the fact that she was still an exempt employee during some of that period.  Her reclassification occurred in November of 2016 and she was terminated in May of 2017.

24

25        [7] Plaintiff submitted a declaration in support of her Opposition to Def.'s Mot., which Defendant asks the Court to strike in its entirety as a sham declaration.  Pl.'s Decl., ECF No. 19-4; Def.'s Reply, ECF No. 20 at 4.  "The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony."  Yeager v. Bowlin, 693 F.3d 1076, 1080 (9th Cir. 2012) (citing Van Asdale v. Int'l Game Tech., 577 F.3d 989, 998 (9th Cir. 2009).  While the declaration arguably contains some discrepancies with the testimony she offered at deposition, in the Court's estimation those discrepancies do not rise to a level sufficient to characterize it as a "sham" document subject to being disregarded entirely.

26

27

28

1  Substances Control v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998) (applying summary

2  judgment standard to motion for summary adjudication).

3       In a summary judgment motion, the moving party always bears the initial

4  responsibility of informing the court of the basis for the motion and identifying the

5  portions in the record "which it believes demonstrate the absence of a genuine issue of

6  material fact." Celotex, 477 U.S. at 323.  If the moving party meets its initial

7  responsibility, the burden then shifts to the opposing party to establish that a genuine

8  issue as to any material fact actually does exist.  Matsushita Elec. Indus. Co. v. Zenith

9  Radio Corp., 475 U.S. 574, 586-87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S.

10  253, 288-89 (1968).

11       In attempting to establish the existence or non-existence of a genuine factual

12  dispute, the party must support its assertion by "citing to particular parts of materials in

13  the record, including depositions, documents, electronically stored information,

14  affidavits[,] or declarations . . . or other materials; or showing that the materials cited do

15  not establish the absence or presence of a genuine dispute, or that an adverse party

16  cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).  The

17  opposing party must demonstrate that the fact in contention is material, i.e., a fact that

18  might affect the outcome of the suit under the governing law.  Anderson v. Liberty Lobby,

19  Inc., 477 U.S. 242, 248, 251-52 (1986); Owens v. Local No. 169, Assoc. of W. Pulp and

20  Paper Workers, 971 F.2d 347, 355 (9th Cir. 1987).  The opposing party must also

21  demonstrate that the dispute about a material fact "is 'genuine,' that is, if the evidence is

22  such that a reasonable jury could return a verdict for the nonmoving party." Anderson,

23  477 U.S. at 248.  In other words, the judge needs to answer the preliminary question

24  before the evidence is left to the jury of "not whether there is literally no evidence, but

25  whether there is any upon which a jury could properly proceed to find a verdict for the

26  party producing it, upon whom the onus of proof is imposed." Anderson, 477 U.S. at 251

27  (quoting Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)) (emphasis in original).

28  As the Supreme Court explained, "[w]hen the moving party has carried its burden under

1 Rule [56(a)], its opponent must do more than simply show that there is some

2 metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586.  Therefore,

3 "[w]here the record taken as a whole could not lead a rational trier of fact to find for the

4 nonmoving party, there is no 'genuine issue for trial.'" Id. at 587.

5      In resolving a summary judgment motion, the evidence of the opposing party is to

6 be believed, and all reasonable inferences that may be drawn from the facts placed

7 before the court must be drawn in favor of the opposing party.  Anderson, 477 U.S. at

8 255.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's

9 obligation to produce a factual predicate from which the inference may be drawn.

10 Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd,

11 810 F.2d 898 (9th Cir. 1987).

12

13                   **ANALYSIS**[8]

14

15     **A.**     **Plaintiff's First Cause of Action: Gender Discrimination Under FEHA**

16      Plaintiff's FEHA, gender discrimination claim is based on the allegations that:

17 (1) Stark expected her to perform her work above par because she is female; (2) he

18 ignored her when she voiced concerns; (3) she was denied resources needed to do her

19 job; (4) Stark nonetheless approved resources for other departments headed by male

20 employees; and (5) female but not male employees were reclassified as non-exempt.[9]

21

22      [8] Plaintiff requests judicial notice of the following documents: (1) Fair Labor Standards Act Salary Register for 2016; (2) Decision and Order from the Board of Pharmacy Department of Consumer Affairs Case No. 4621 (In Re: Matthew R. Washburn); (3) Complaint for Damages, Jason Chima v. Orchard

23 Hospital, Butte County Superior Court Case No. 19CV00307; (4) Court Docket, Judy Robertson v. Orchard Hospital, Butte County Superior Case No. 164998; and (5) Cal. Gov't Code § 12945.2.  That request is

24 GRANTED.  See Fed. R. Evid. 201.

25      [9] Plaintiff also alleges that there was a delay in her receiving a raise of $50.00 per hour because of her gender.  Defendant argues that all of Plaintiff's FEHA claims based on this raise are untimely and

26 should be dismissed pursuant to Gov't Code § 12960(d) because Plaintiff waited more than a year after her 2015 salary issue and filing an administrative complaint with the DFEH on June 16, 2017.  Def.'s Mot.

27 at 14:4-8.  The Court disagrees.  Under the continuing violation doctrine, an employer is liable for actions that take place outside the limitations period if these actions are sufficiently linked to unlawful conduct that occurred within the limitations period.  Yanowitz v. L'Oreal USA, Inc., 36 Cal. 4th 1028, 1029 (2005); Pl.'s

28 Opp'n at 18:4-7.

1   As a result, Plaintiff contends she was denied reasonable accommodations under the

2   FMLA, and she suffered loss of income, loss of business opportunities, and emotional

3   distress.  Compl. ¶¶ 12-16; Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n") at

4   11:12-16.

5        Cal. Gov't Code § 12940(a) makes it unlawful for an employer, because of

6   gender, "to bar or to discharge the person from employment or from a training program

7   leading to employment, or to discriminate against the person in compensation or in

8   terms, conditions, or privileges of employment."  Under the <u>McDonnell Douglas</u> test for

9   FEHA discrimination claims, the plaintiff can establish a prima facie case by showing:

10  (1) the employee is a member of a protected class, (2) she was competently performing

11  in the position held; (3) the employee suffered an adverse employment action; and

12  (4) some other circumstance suggesting a discriminatory motive.  <u>McDonnell Douglas</u>

13  <u>Corp. v. Green</u>, 411 U.S. 792, 802-03 (1973); <u>see also</u> <u>Godwin v. Hunt Wesson, Inc.</u>,

14  150 F.3d 1217, 1220 (9th Cir. 1998).  Once a plaintiff establishes a prima facie case of

15  discrimination, the burden shifts to the defendant to articulate a legitimate

16  nondiscriminatory reason for the adverse employment action. <u>McDonnell Douglas</u>,

17  411 U.S. at 802-03.  If the employer is successful in establishing a legitimate reason, the

18  burden shifts back to the employee in proving that the reason for the adverse action was

19  discriminatory, "such that a trier of fact could conclude that the employer was engaged in

20  intentional discrimination."  <u>Horn v. Cushman & Wakefield Western, Inc.</u>,

21  72 Cal. App. 4th 798, 806-07 (1999).

22       The parties do not dispute that Plaintiff is a member of a protected class or that

23  she competently performed her job duties.  Instead, Defendant contends that Plaintiff

24  cannot show an adverse employment actions or a causal connection between any such

25  action and her gender.

26               **a.    Adverse Employment Actions**

27       "[A]n adverse employment action is one that 'materially affect[s] the

28  compensation, terms, conditions, or privileges of… employment.'"  <u>Davis v. Team Elec.</u>

1   Co., 520 F.3d 1080, 1089 (9th Cir. 2008) (quoting Chuang v. Univ. of Cal. Davis,

2   225 F.3d 1115, 1126 (9th Cir. 2000)).  "[A]ssigning more, or more burdensome, work

3   responsibilities, is an adverse employment action."  Id.  Such actions also include

4   terminations, demotions, and significant changes in compensation or benefits.

5   Rubadeau v. M.A. Mortenson Co., 2013 WL3356883 at *3 (E.D. Cal. July 3, 2013).  With

6   respect to Plaintiff's First Cause of Action, the alleged adverse employment actions

7   include (1) the denial of equivalent pay and job status; (2) withholding resources

8   necessary to do her job; and (3) termination.  These are clearly adverse employment

9   actions.  The Court accordingly turns its analysis to causation.

10                  **b.    Causation**

11          Defendant contends that Plaintiff cannot show any of the foregoing actions were

12   undertaken as a result of her gender because her salary was affected by her credentials,

13   budgetary restrictions limited her resources, and her termination was based on the

14   Hospital's policy with regard to theft.

15          First, according to Defendant, because Plaintiff, unlike Mundh was neither a

16   registered nurse, nor the Director of Infectious Disease Prevention, she was not offered

17   a $50.00 per hour equivalent rate of pay until she completed certain certifications.  In

18   addition, Defendant contends that Plaintiff cannot establish that a male employee with

19   the same credentials would have been treated differently under the circumstances.

20   Def.'s Mot. at 14:9-19.  For her part, however, Plaintiff points out that prior to her

21   promotion she was already a registered respiratory therapist who was running two full-

22   time departments.  DMF Nos. 14-16.  In addition, Plaintiff has a Bachelor's of Science

23   Degree in Respiratory Care and a Master's Degree in Business Administration, with an

24   emphasis in Healthcare Management.  Pl.'s Depo at 14:1-5.  Given Plaintiff's

25   qualifications, a trier of fact could reasonably conclude that Plaintiff was more than

26   qualified for the raise to $50 per hour even without the additional credentials.

27   Accordingly, Defendant has not shown it is entitled to judgment as a matter of law on this

28   issue.

11

1    Second, according to Plaintiff, the only directors reclassified as non-exempt were

2    all women.  The director not reclassified was a man.  Moreover, within days after

3    reclassification, Plaintiff received a job description confirming her need to be available on

4    a twenty-four hour basis, a requirement that runs counter to a non-exempt

5    characterization.  Accordingly, construing all facts and making all inferences in Plaintiff's

6    favor, the Court concludes summary judgment would be inappropriate.

7    Third, Plaintiff contends that she was denied support or additional resources, but

8    that Stark frequently approved resources for departments that were headed by male

9    employees.  Compl. ¶ 15:25-27.  Plaintiff's sole complaint in this regard relates to the

10   Hospital's purchase of a software program Plaintiff had been requesting for over a year.

11   Although Defendant cites budgetary concerns for the denial of Plaintiff's requests, she

12   was acting within her own department budget the entire time.  Moreover, approval was

13   only finally granted when Stark circumvented Plaintiff and spoke with the software

14   company directly.  Again, given these circumstances, a trier of fact could reasonably find

15   intentional discrimination.

16   Finally, Defendant contends that Plaintiff cannot establish causation between her

17   termination and gender.  The Court disagrees.  Based on all of the foregoing evidence, it

18   can be inferred that Defendant acted with discriminatory animus.  Plaintiff had been

19   employed by the Hospital for eight years, by all indications had been an exemplary

20   employee, and had never been subjected to disciplinary proceedings of any kind before

21   being summarily terminated for "stealing" a small sum of money, based on discrepancies

22   in her time cards, and against a record that seems to indicate she had been working

23   around the clock without compensation in any event.  There is testimony from both

24   Plaintiff and Atkins suggesting that the two had reached an understanding about Plaintiff

25   informally taking FMLA leave despite what Plaintiff had been told by other management

26   personnel about not working from home.  Moreover, Atkins still avers that if it was up to

27   her, Plaintiff would probably still be working at the Hospital.

28   ///

Most damning, however, is the Hospital's retention of a male employee who had previously admitted to "stealing."  Plaintiff alleges that Matthew Washburn, who was working as a Pharmacy Technician at the Hospital, was retained despite the fact he was forced to surrender his pharmacy license after pleading guilty to the theft of some 6,858 tablets of a narcotic agent, Hydrocodone.  DMF No. 2.  Instead of being terminated, Plaintiff claims Washburn was simply transitioned to another role within the Hospital and was eventually promoted.  While Defendant claims that Washburn's case is not analogous because his theft occurred while working for a previous employer, CVS, the Court believes a trier of fact could nonetheless decide that the difference in his treatment is dispositive.  Accordingly, Plaintiff's claim of termination because of her gender therefore also survives summary judgment.

For all the reasons outlined above, Defendant's Motion for Summary Judgment as to Plaintiff's First Cause of Action is DENIED.

## B.    Plaintiff's Second Cause of Action:  Retaliation under FEHA

Plaintiff's Second Cause of Action alleges retaliation pursuant to Cal. Gov't Code § 12940(h).  Under this section, it is unlawful for an employer to "discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part."  Cal. Gov't Code § 12940(h).  Doe v. City of San Francisco, 835 F. Supp. 2d 762, 772 (N.D. Cal. 2011).  To establish a prima facie case of retaliation under FEHA, Plaintiff must show: (1) the employee engaged in a protected activity; (2) the employee was subjected to an adverse employment action; and (3) a causal link existed between the protected activity and the employer's action. Yanowitz, 36 Cal. 4th at 1036.  Once an employee has established a prima facie case for retaliation, the employer is required to offer a legitimate, non-retaliatory reason for the adverse employment action.  Id.  (citing Morgan, 88 Cal. App. 4th at 68).

Plaintiff alleges in her Complaint that she "engaged in protected activity when she made a series of complaints about her superior's improper evacuation tactics, when she

1    complained about gender discrimination to Human Resources, and when she requested

2    family medical leave." Compl. ¶ 20.[10]  Plaintiff goes on to claim she was terminated in

3    retaliation for engaging in those protected activities. Def.'s Mot. at 18:8-11.  Defendant,

4    on the other hand, contends that Plaintiff's retaliation claim fails because the Hospital

5    has no record of Plaintiff's complaints and Plaintiff received FMLA benefits when she

6    requested them.

7            These arguments are of no moment here.  First, Plaintiff appears to claim that her

8    complaints to Perumal and to Atkins were informal in nature.  Evaluating the respective

9    credibility of Plaintiff, on the one hand, and Atkins and Perumal[11] on the other, is a

10   question that must be resolved by the trier of fact as opposed to this Court on summary

11   judgment.

12           Second, Defendant further contends that Plaintiff cannot establish a prima facie

13   case of retaliation because, when Plaintiff did formally ask for FMLA leave, she received

14   time off as requested.  Def.'s Mot. at 20:14-18.  In contrast, not only does Plaintiff claim

15   that she reasonably believed that she was exercising her FMLA when she was working

16   from home, she also avers that she was denied reasonable accommodations in order to

17   work from home as a Director and to tend to her autistic son on the mornings that he had

18   a behavioral episode that required her assistance.  Pl.'s Opp'n at 19:10-12.  Plaintiff

19   states that she reasonably believed that she was exercising her FMLA on the mornings

20   she was working from home and tending to her son.  Id. at 19:21-22.  In addition, as

21   enumerated above, Plaintiff claims that Atkins told her repeatedly to keep managing her

22   time as she had beforehand in handling her son's needs.  As previously stated, these

23   are factual issues extending beyond the purview of summary judgment.  Defendant's

24           [10] This reference to the Hospital's evacuation tactics refers to its handling of emergency
25   procedures following the Oroville Dam's failure in 2017.  More specifically, Plaintiff claims that she was
     retaliated against for pointing our shortcomings in procedures the Hospital employed at that time.  Such
26   complaints are not protected activities falling under the purview of FEHA, and consequently cannot form
     the basis for FEHA-premised retaliation.  See Arn v. News Media Group, 175 Fed Appx. 844, 846 (9th Cir.
27   2006).
             [11] While Atkins denies in her Declaration that Plaintiff ever talked with her about gender bias (see
28   Atkins Decl., ¶ 32), no evidence has been presented by the Hospital with respect to Perumal's recollection
     as to any such complaints.

1  Motion for Summary Judgment as to the Second Cause of Action, for retaliation under

2  FEHA, is therefore also DENIED.

3       **C.**    **Plaintiff's Third Cause of Action:  Gender Harassment under FEHA**

4       Plaintiff's Third Cause of Action alleges harassment based on her gender.  Cal.

5  Gov't Code § 12940(j)(1), provides that it is an unlawful employment practice for "an

6  employer . . . or any other person, because . . . sex [or] gender, . . . to harass an

7  employee… Harassment of an employee . . . shall be unlawful if the entity, or its agents

8  or supervisors, knows or should have known of this conduct and fails to take immediate

9  and appropriate corrective action… An entity shall take all reasonable steps to prevent

10  harassment from occurring . . . ."  <u>Nazir v. United Airlines, Inc.</u>, 178 Cal. App. 4th 243,

11  263 (2009).

12       Plaintiff alleges that she was subjected to a hostile work environment because of

13  her gender.  According to Plaintiff, Stark created such an environment when he

14  reclassified her as non-exempt, while still requiring her to provide 24-hour oversight as a

15  Director.  DMF No. 28.  In addition, she alleges that Stark tolerated and encouraged

16  harassment against Plaintiff, held meetings during times in which he knew Plaintiff was

17  absent on family medical leave, and degraded Plaintiff to her coworkers.  Compl. ¶ 29.

18  Finally, Plaintiff alleges that Defendant failed to take all reasonable steps to prevent and

19  redress discrimination and harassment against Plaintiff.

20       In order for Plaintiff to show a claim for gender harassment, she must prove that

21  she was subjected to "unwelcome conduct based on gender or disability that is

22  sufficiently severe or pervasive to alter the conditions of her employment and create an

23  abusive working environment."  <u>Haley v. Cohen & Steers Capital Mgmt.</u>, 871 F. Supp. 2d

24  944, 956 (N.D. Cal. 2012) (internal quotations omitted).  In addition, an employee may

25  establish such a claim by showing that widespread sexual favoritism was severe or

26  pervasive enough.  <u>Miller</u>, 36 Cal. 4th at 462.  When evaluating whether harassment

27  exists, courts look to the totality of the circumstances.  <u>Brooks v. City of San Mateo</u>,

28  229 F.3d 917, 923 (9th Cir. 2000).  Under all of those circumstances, as articulated in

1    detail in the foregoing sections, there is more than enough basis on which a jury could

2    rest a conclusion in Plaintiff's favor.  Defendant's Motion for Summary Judgment as to

3    Plaintiff's Third Cause of Action is consequently DENIED.

4         **D.    Plaintiff's Fourth Cause of Action:  Failure to Prevent FEHA Violations**

5         Plaintiff's Fourth Cause of Action alleges failure to prevent discrimination,

6    harassment and retaliation.  Specifically, Plaintiff alleges that Defendant failed to

7    implement adequate training, policies, monitoring, or instructions that would have

8    prevented the foregoing.  Compl. ¶ 36.  It is unlawful for an employer to "fail to take all

9    reasonable steps necessary to prevent discrimination and harassment from occurring."

10   Cal. Gov't Code § 12940(k). This claim is derivative of Plaintiff's above claims and

11   survives with them as well.  Consequently, Defendant's Motion for Summary Judgment

12   as to the Fourth Cause of Action is DENIED.

13        **E.    Plaintiff's Fifth Cause of Action:  CFRA Retaliation**

14        Plaintiff's Fifth Cause of Action is brought pursuant to the California Family Rights

15   Act ("CFRA") and Cal Gov't Code § 12945.2.   According to Plaintiff, she was terminated

16   while on leave under the CFRA and the FMLA.  Plaintiff alleges that "the leave she took

17   and her complaints about gender discrimination were motivating reasons for Defendant's

18   decision to terminate [her]."  Compl. ¶¶ 42-43.

19        "The elements of a CFRA retaliation cause of action are: (1) the defendant was a

20   covered employer; (2) the plaintiff was eligible for CFRA leave; (3) the plaintiff exercised

21   his right to take a qualifying leave; and (4) the plaintiff suffered an adverse employment

22   action because he exercised the right to take CFRA leave." Weeks v. Union Pacific

23   Railroad Co., 137 F. Supp. 3d 1204, 1230 (E.D. Cal. 2015) (citing Rogers v. Cnty. of

24   L.A., 198 Cal. App. 4th 480 (2011)).  Again, adverse employment actions can include, for

25   example, terminations, fines, or suspensions.  Id.

26        It appears to this Court that Defendant only takes issue with the fourth

27   prerequisite for alleging a CFRA claim; namely, that Plaintiff suffered an adverse

28   employment action.  As already discussed, however, the Court found that there are

1   genuine disputes of material facts as to this issue and Defendant's motion for summary

2   judgment as to Plaintiff's Fifth Cause of Action is thus also DENIED.

3          **F.      Plaintiff's Sixth Cause of Action:  Wrongful Termination**

4          Plaintiff alleges in her Sixth Cause of Action that Defendant violated the

5   fundamental public policies of the State of California as set forth in California

6   Government Code § 12940 and the California Constitution, and that her termination was

7   accordingly wrongful.  Compl. ¶ 48.  Courts have held that FEHA provisions prohibiting

8   discrimination may provide the policy basis for a claim of wrongful discharge in violation

9   of public policy.  Phillips v. St. Mary Reg'l Med. Ctr., 96 Cal. App. 4th 218, 227 (2002).  In

10  order to establish a claim for wrongful termination in violation of public policy, the plaintiff

11  must prove that she was terminated because of her protected status or engaging in a

12  protected activity.  Turner v. Anheuser-Busch, Inc., 7 Cal. 4th 1238, 1256-59 (1994); see

13  also Def.'s Mot. at 24:1-2.  Significantly, wrongful termination in violation of public policy

14  is subject to the same FEHA discrimination analysis.  Nelson v. United Tech.,

15  74 Cal. App. 4th 597, 613 (1999).  Accordingly, since Plaintiff's FEHA discrimination

16  claims survive, so does this one, and Defendant's Motion for Summary Judgment as to

17  Plaintiff's Sixth Cause of Action is DENIED.

18         **G.      Punitive Damages**

19         Under California law, the entitlement to punitive damages against an employer

20  hinges on proof, by clear and convincing evidence, that an "officer, director, or managing

21  agent" either perpetrated or knowingly ratified conduct amounting to malice, oppression,

22  or fraud.  Cal. Civ. Code § 3294(b); see also College Hospital Inc. v. Sup. Ct., 8 Cal. 4th

23  704, 723 (1994).  Defendant contends that Plaintiff is not entitled to punitive damages

24  because, in her discovery responses, she failed to identify any officer, director or

25  managing agent subjecting the Hospital to punitive damages.  Instead, Plaintiff identified

26  only "Defendant."  Def.'s Mot. at 24:22-25.  Plaintiff claims she intended to refer to the

27  Hospital's CEO and managing agent, Steve Stark, who Plaintiff alleges acted with ill-will

28  and malice.  SUF Nos. 163-64.

1    Because there is a genuine dispute of material fact as to whether Stark acted with

2    ill-will and malice, and since issues pertaining to punitive damages normally present

3    factual issues that should be decided by the jury and not this Court on summary

4    judgment, Defendant's demand for summary adjudication as to Plaintiff's request for

5    punitive damages is DENIED.

6

7                              **CONCLUSION**

8

9    For the reasons set forth above, Defendant's Motion for Summary Judgment, or

10   for partial summary adjudication, ECF No. 13, is DENIED.

11   IT IS SO ORDERED.

12   Dated:  August 21, 2020

13

14   _____
     MORRISON C. ENGLAND, JR.
15   SENIOR UNITED STATES DISTRICT JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28